Good morning. I believe it's still morning. I would like to reserve seven minutes for rebuttal. Okay, watch your clock. So, the school supports the Purple Line extension, but it is critically important that in funding and constructing a popular and necessary project that the agencies are held to the same exacting environmental standard that we hope would be applied when another agency claims that a 10-lane highway or a nuclear power plant must be located next to an inner-city elementary school or in the habitat of an endangered species. Here, the district court abused its discretion on the law and facts in denying an injunction, preventing the agencies from entering into two contracts committing over a billion dollars to the construction of an alignment between the Wilshire-Rodeo Station to Century City. That alignment is an alignment that the court had already directed that on remand the agencies must analyze to decide if there were any feasible and prudent alternatives to that alignment. The court also abused its discretion in failing to vacate the rod in the first place. Aren't there some current problems with fault lines? As of today, you mean, Your Honor? What? As of today, Your Honor, or earlier problems with fault lines? Now, now we know. Yes. It's been in the papers for a week. Is that right? Yes, that's correct. So one of the areas that the agencies have been asked to review on remand is the feasibility and completeness of its seismic exploration. It does appear in the last few weeks that there have been developments that there are significant faulting activities, including potentially directly beneath the school district. But they don't have that problem under the school. Well, as of right now, we do not have that problem under the school. That is our position. But CGS seems to think that maybe we do, yes. But they're going down 60 feet. It's unclear to me, based on the developments of this week, whether or not the seismic activity will interfere with the alignment. But that is part of what the agencies are supposed to be doing on remand, which our position is, and under the case law of the Ninth Circuit, they are not free to do if they have massive commitments to construct a particular alignment. They can't freely consider whether they ought to be constructing that alignment somewhere else for another reason. Well, that's a good spot to put it, isn't it? Pretty direct. Well, there's far more direct routes, actually, between if you wanted to assume for the purposes of our discussion that the station should be at Constellation Boulevard and not at Santa Monica. There are far more direct alignments that run directly from Wilshire Rodeo to the Constellation Boulevard station. They would still go beneath the school, which would be fine. They wouldn't go underneath the buildable area that would impact our ability to expand our recreational facilities. And they wouldn't go directly under historic buildings, putting at risk students who actually use those classrooms. Counsel, isn't that long been decided now? I mean, you didn't appeal from the, when the court did remand, you let the building of the line go forward and remanded to FTA to do a supplemental environmental analysis. What we're talking about today is whether or not the district court abused its discretion in not entering into the grant agreement and the design-build contract. And now that they have entered into those contracts, why isn't this case moved? Okay. First, we did not appeal the order from August of 2016 because it was not appealable. Under Pitt River 2, it was not an agreement. I mean, it was not an action that was final in the sense that it was remanded. And we would have had an opportunity, in theory, at the end of the process to appeal. So it was not an appealable paper. It also wasn't an appealable paper under Honolulu traffic either because unlike Honolulu traffic, the court here didn't issue a final judgment. It specifically and explicitly retained jurisdiction to watch over the remand process. So we were not in a position to appeal in August. But what we did instead was we watched very carefully the developments. The decision by the district court in August of 2016 not to vacate the ROD, which is a presumptive remedy, was based upon statements by Metro. Those statements were about when it was going to do its SEIS and when it was going to enter into these contracts. The issue there was that we thought it was at least possible that the SEIS might be much further along by the time the contracts entered into. But now we're sitting here and they have entered into the contracts, right? Correct. That's what you were seeking to enjoin. That was not the extent of the relief we requested. We understood at the time that we entered into the motion seeking to enjoin that it was possible that the agencies would, in fact, do more, go ahead and sign those contracts before we had the ability to even get them ruled on. Did you ask for more than just the not? We absolutely did. In every single one of our notices and elsewhere, we asked in addition to just enjoining the execution of the contracts, we also asked the court to set aside the contracts in the event they were already entered into or, as possible here, to simply enjoin the FTA from permitting its funding to be used for the design-build contract. So we asked for a variety of relief, much of which is still available. And under the AmeriCare case, it doesn't matter if the exact relief that we asked for is no longer available as long as there is some relief that the court can provide that will effectively remedy the wrong. And that relief is available here. All right. I still don't see why you couldn't have appealed the summary judgment that was entered against you. The summary judgment that was entered against us was entered on only some counts. In most counts, we were given actually it was entered for us. The issue was, was the remedy that was given for the summary judgment in our favor correct? We contend it was not correct. However, instead of issuing a final judgment with respect to the remedy, what the court said was, and he said this in multiple places throughout the record, he said, look, this is what I'm doing here. It's unusual. So what I'm going to do is I'm going to not vacate the rod here, but I'm going to retain jurisdiction. And retaining jurisdiction, I'm going to watch what FTA does. But that in and of itself is highly unusual. It is highly unusual, but it also by maintaining jurisdiction and refusing to issue a final order, the court did in fact rob us of the ability to have an appealable paper in our hand to bring to this court. Now, we didn't wait. We didn't sit on that for two years. What we did instead was we watched carefully. And as soon as we saw conditions that we had complained were of concern and would render basically completely flawed and a rubber stamp on the subsequent analysis ordered, we went back to the district court and we said, district court, look, you've got to take a look at this and you've got to stop them from entering into these contracts. They have a remand analysis they have to do. They have to consider feasible and prudent alternatives. So he said no and now you're here and they've entered the contracts. Correct. But there's other relief that we sought and there's other relief that's available to us. What other relief is there right now? Right now, this court can remand to the district court and direct it to order the FTA to stop funding the full funding grant agreement. FTA is not a party to the, I apologize, to stop funding the design-build contract. So the full funding grant agreement is an agreement between Metro and FTA. In turn, the design-build contract is between Metro and Tudor-Perini. What FTA can do and what the district court can do is it can enjoin FTA from permitting any of the funds that it is allocating under the full funding grant agreement to go to the design-build contract. The design-build contract here is the real problem. And it's the real problem because it is a contract between Metro and a third party to build an alignment that is supposed to be under review. That is utterly inconsistent with all of the Ninth Circuit's case law on this subject, including Pitt River One, Metcalf, Latham v. Volpe. All of those cases hold that when you have a binding commitment to an outcome before you've done the analysis, the analysis is flawed. And what Judge Wu really got wrong here is that Judge Wu persists in a belief that if the analysis looks good at the end, if the I's are dotted and the T's are crossed, it doesn't matter if these contracts were in existence. That's not true. As the case law clearly represents, it is the case that the existence of the contracts undermine the validity of the process, and that's the injury here. Why is that? Why does that happen? Why is that true? Undermines the validity of the process. Well, the only thing that's guaranteed to the litigants here under NEPA and under Section 4F is an objective process. It's an action-forcing statute. And so what we're trying to do is make the agencies have in front of them at the time of the decision the full environmental analysis. As this court found in Pitt River 1, if you're engaging in activities that commit you to an outcome, the environmental assessment you do afterwards is not useful. It can't operate to inform decision-makers, and so it needs to be set aside. We're going to need to set this aside at the end anyway, so we should set it aside now to preserve the schedule of the project. Why are you going to have to set it aside eventually? You're going to have to set it aside eventually because these contracts are in place, and the decision that the FTA ultimately makes in the fall of this year about whether it can move the alignment will be wholly undermined by the fact that it is already committed to a particular alignment to the tune of over $1.2 billion. Which is why you should have appealed the remedy order. Under all of the case law, including Pitt 2, we could not have done that. But even if we should have appealed the remedy order, it's not, as you suggested earlier, it's not that we waited. We didn't wait two years, six months. We waited two months to see whether the district court was going to live up to its promise to monitor FTA and Metro's conduct. When the district court refused to do that, we appealed immediately. I have three minutes left and I'll reserve. Three and a half. Three and a half. Good morning. I'm Dave Gunter from the Department of Justice. Here on behalf of FTA. FTA's goal in funding this project is to promote safe and efficient. Why don't you walk a little closer? Because I can't see you. You look fine. Better? All right. Very good. Thank you. FTA's goal in promoting this project is to promote safe, efficient public transportation for tens of thousands of people every day in Southern California's busiest public bus corridor. Now, the argument that by agreeing to fund this project, FTA has somehow already decided a single specific issue that the district court asked it to reconsider is just wrong. But more importantly, the district court has already heard that claim. It made a decision on the merits that signing the grant agreement and the design-build contract would not violate NEPA or constitute a prejudgment of the NEPA process. Do you agree that what was sought was not just an injunction against signing the contracts, but actual implementation funding? I do. And that's why we didn't argue mootness in our opening brief. But I would point out that there's a disconnect between that and the legal theory that Beverly Hills is relying on here. Under their legal theory, the real problem is the moment at which the contract is signed. They're saying that by signing the contract, FTA has somehow committed to a particular alignment. And if that is true, if that's their legal theory, then I think the court could find the case moot because the agreement is already signed. And, in fact, they say that a lot of other things show that FTA has already committed to this alignment. But part of their argument also is that the deeper and deeper they get into the funding and implementation, the more committed the agencies are and therefore less and less likely, for instance, to really take a, quote, hard look and give a full analysis. And given the limited scope of review by the court of the NEPA analysis, they're being prejudiced and put more and more into a box progressively over time. That is their argument. And so I would make two points in response to that. First is that under this court's case law, particularly Wild West Institute and National Parks Conservation Association, it's really a commitment of natural resources and not a commitment of financial resources that is an irretrievable commitment of resources for purposes of NEPA. So, for example, cutting trees or threatening and endangered species. That's not what we have here. Here, FTA faces no financial liability if this decision is changed. Its participation is capped. And so it has no financial incentive to decide one way or the other about the alignment. Well, there are some cases that talk about irretrievable commitment when all the money has been spent. I mean, if you had a budget of $1 billion and you spend $900 million of it. That's true. But here the grant is $1.2 billion. And so far, as of today, FTA has dispersed about $65 million of it, much of that for activities that are related to the project as a whole and not specific to any particular location. So wouldn't your point be that in order for there to be actionable conduct, there has to be an irretrievable commitment and just sort of being biased or a risk of being biased or taking a position, having the mental state of not being totally open to the process is not irretrievable commitment? That's right. The legal question for purposes of predetermination is whether we have crossed a line from simple preference, which is fine, to predetermination, which is not okay. And one thing that the courts look at to decide whether that has taken place is whether the agency has given itself essentially incentives not to change its decision, whether it has given itself incentives to rationalize a decision that's already been made. And so I'd point out that here all the incentives are on the side of an open and objective NEPA process on remand. This is a very public process. The district court is supervising it closely. Beverly Hills is lawyering this process within an inch of its life. And there's essentially no reason for the court to find now that FTA has already made a decision here rather than have the district court wait for the administrative record to be compiled and look at that record to see whether FTA has taken part of the issues. But their argument is that the incentive is there. The more money that is spent on the one alternative, the less likely they're going to find other alternatives through the EIS process. Well, it's true that the agencies, FTA and Metro, will have to justify whatever decision they make not on the basis of the money that they've already spent. And the district court has said that he is going to look carefully at that and is not going to allow the agencies to justify their decision on the basis of money that's already spent. But as Judge Pregerson's question pointed out, there may be very good reasons to have the station location at Constellation and not at the Santa Monica location. It's okay for Metro to have that preference and to make the decision on those factors. I don't think that the facts here show that FTA is making a decision based on improper financial factors as opposed to the actual environmental consequences of the various alternatives. But the other thing I would point out is that even if FTA were doing that, this would not be the time for Beverly Hills to bring its claim. There's no final agency action yet. They're asking this court to award them relief not on the basis of what FTA has done, but on the basis of what they are asking the court to predict that FTA will do in the future. Right, because they're still conducting. When are they going to be finished with the matters that are under remand? There is no fixed date, but the comment period for the supplemental EIS closes on Monday. Beverly Hills actually has an extra week past that as a special accommodation to them to make sure that we consider all the issues they want to bring to our attention. After that, it's likely to take a couple of months to come up with a final supplemental EIS, and we expect to have all of these issues back before Judge Wu well in advance of any construction beginning. There will be no construction here until January 2018 at the earliest, and what construction there will be at that time is likely to be mainly directed at the Wilshire Rodeo Station, which is not in dispute here. So that relates not only to whether they can win on the merits of their preliminary injunction appeal, whether there's a final agency action here that they can challenge, it also relates to the equities. They say that there's no reason to allow these activities to keep going forward, but in fact, from METRO's perspective, I'm not here on METRO's behalf, but in the EIS process, they're saying this process can continue while we undertake important funding and planning activities that will allow us to keep this project on a timely basis. And if those get delayed, the public will be harmed by a delayed project. But Beverly Hills doesn't have a countervailing concrete interest that is being imminently threatened with harm by the signing of the grant agreement or the design-build contract. Judge Wu has committed to them, and we understand that this is part of this process, that he will protect their interests by reviewing whatever FTA does on remand before FTA is allowed to begin construction. So it was within his discretion to say, I'm not going to award a preliminary injunction now. I'm going to wait until I have a chance to review this on the record and then decide whether an injunction is necessary  That would be based on his assessment of the adequacy of the EIS as supplemented under normal NEPA rules, right? Yes, it would be. And that's a fairly differential standard. That is, the judge has to make sure the process is followed. It's a procedural. I mean, it sounds like he maybe is threatening or suggesting he would exercise super supervision. Yeah, the judge has to take hold of it and live it and follow it day by day. There's something to what Judge Pragerson is saying, which is that the judge will have a complete administrative record, and he is now actively supervising this process. He will be able to see what the agency has done. And so when we get there, we will argue, Judge Chen, that he should defer to us on technical matters. But if Beverly Hills wants to present its prejudgment claim to him at that time, Beverly Hills will have the opportunity to do that. And he can vacate the supplemental rod on the basis that it was prejudged. He could vacate it on the basis that it was prejudged today. But Beverly Hills has to wait until there is a final agency action that they can challenge to ask Judge Wu to give them that relief. And all of the cases, in fact, about predetermination have stopped an agency decision that has already been made, not stopped the NEPA process while it is still going on. So what is actually going on with respect to the design contract? The contractor, Tutiparini, is undertaking pre-construction activities, like design activities. My understanding is that the design for the Wilshire-Rodeo Station, which is not at issue here, will be completed in about February 2018, and the design for the Constellation Station, if that is ultimately chosen in the EIS, in the supplemental process, will be ready in about August 2018. Tunnel boring is not set to begin until the end of 2018. And in the meantime, they'll do things like property acquisition, utilities location, things that can be reversed, and things that are not so – things that are not such a financial commitment that they should lead to a presumption of bias in the EIS process. What would Judge Wu have to find in order to make the predetermination – to find there was predetermination and noncompliance? What is the standard of judicial review? He would have to find – well, the standard of review, I think – Abuse of discretion. The standard of review for a PI is abuse of discretion. The standard of review under the APA is, has the agency taken a hard look? And in order to determine whether the agency has taken a hard look, he would have to find that the agency has not prejudged. The standard for that is whether the agency has made an irreversible and irretrievable commitment of resources that precludes it from taking an objective hard look at the environmental issues related to the various alternatives. What we're hoping is that the administrative record will show to Judge Wu that METRO and FTA are taking an objective hard look, as all of the incentives in this case lead them to do. Obviously, these agencies would rather pay whatever penalties there are for a change to the existing design-build contract than have that contract vacated, go through another year of contract procurement, and then have a higher bid at the end. That would be much, much more expensive to the agencies than changing this contract. So our incentives are to take an objective and hard look. And what we're asking this Court to do is send Beverly Hills back to district court so that Judge Wu can make that determination about a final agency action on the administrative record before he has to rule on that, not preempt the NEPA process by granting a preliminary injunction based on what they think. The safety net they have in terms of irreparable injury balance of hardships at this point is the fact that the judge can look at the whole prejudice, irretrievable commitment, predetermination factor when this is completed. Yes. Now is not the time to look at it. That's right. If Judge Wu thinks that that is a problem, that a NEPA violation has occurred, that NEPA violation is reparable. He can simply hold that a violation has occurred and vacate the supplemental rod. So just on the equities element of the preliminary injunction test, Judge Wu did not abuse his discretion by denying an injunction. I want to go back to an issue, unless the Court has more questions on the merits of the PI, I want to go back briefly to the question of whether this Court even has jurisdiction to consider the PI appeal to begin with or whether this appeal is really an untimely appeal of the remedy order. You know, most preliminary injunctions preserve the status quo while the district court has time to consider the underlying claims. But here, Beverly Hills sought its preliminary injunction after the Court had already decided the underlying claims. It had said that signing the grant agreement and the design-build contract would not constitute an irreversible and irretrievable commitment of resources, and it had said that it would not vacate the rod while the remand process was going on. So Beverly Hills' preliminary injunction motion was not trying to get preliminary relief. It was trying to relitigate questions that the district court had already decided and that Beverly Hills had failed to appeal. Now, to address this argument that they couldn't have appealed the order then, I think that Alcee Valley, which establishes this no appeal from a remand order rule to begin with, also establishes the exception that they could have taken advantage of. If appealing a question after a remand would have been pointless, then immediate appeal is allowed under Alcee Valley, and the Court allowed actually a plaintiff to immediately appeal an order remanding in Honolulu traffic. I don't think that they would be able to challenge the order, the decision, the judgment not to vacate the EIS at that point as a matter of interlocutory appeal. They do say that, but I think that's contrary to the case law. Their expectation on that was simply wrong. Alcee Valley says if a remand, if an appeal after a remand would be pointless, you can appeal immediately, and that is the case here. The only question they want to appeal is what relief they were entitled to during the remand. If they wait until after the remand to appeal that process, to appeal that question, it would have been pointless. I think we're saying the same thing. Okay. I'm sorry. I must have misunderstood you. I'm sorry. Instead of waiting for the supplemental EIS, because they really wanted the EIS vacated. That's right. They wanted the original record of decision vacated. And so their merits basis for the preliminary injunction is a merits question that they intend to raise later about the supplemental process. But the remand order and the relief that they want in the preliminary injunction was really about whether the rod should have been vacated in the first place. And Alcee Valley doesn't require them to resort to these procedural shenanigans like a post-merits decision preliminary injunction to appeal that question. It just lets them appeal outright, which is a logical outcome that lets them protect their interests during the remand process, even though the district court retains some jurisdiction. Just like the district court retaining jurisdiction makes no difference to this question. The district court retains jurisdiction during a PI appeal. But because the plaintiff is immediately affected by the denial of the PI, they're allowed an interlocutory appeal. And under Alcee Valley and Honolulu traffic, the same is true here. They were immediately affected by the district court's failure to vacate the rod. The relief that they were seeking would only have been relevant during the remand itself. And so they had an opportunity to come to this court before the remand took place and see whether vacater should have been the remand. But they have appealed just partially, just that part of the order which denied relief during the remand without necessarily taking up the whole remand question. Yes. In fact, I don't want to commit the government on a hypothetical question, but I think that would probably be the only part under Alcee Valley of the remand order. That's the only part that would be futile. I'm sorry? That's the only thing that would have been rendered futile. That's the only thing that would have been futile, because on the rest of it, we need to wait and see what decision FTA makes, whether FTA even ‑‑ whether Metro even chooses the Constellation Station that they say injures them in the first place. And we could have, with the timely appeal from that, we could have considered whether Judge Wu erred in not vacating the ROD, given that he remanded for consideration of these other issues. That's right. And the court would have applied the California Communities Against Toxics standard, which Judge Wu also applied. And I think the court would have come to the same conclusion. You know, part of that standard is what the impact will be on the community. And in California Communities Against Toxics, this court said it was worth allowing the agency action to go forward during the remand to save a power plant that would be constructed and provide 530 jobs. This project is going to provide 64,000 jobs. It was not an abusive discretion for the district court to say planning for this project can continue as long as Beverly Hills concrete interests are not affected until after I have a chance to review this issue further. And that was within his discretion. I see that my time is up, so let me close with this thought. We're not trying to prevent Beverly Hills from making sure that FTA and Metro comply with NEPA. They are entitled to make sure that we comply with NEPA. But they're not necessarily entitled to do it in this untimely attack on the remedy order or in a motion for a preliminary injunction right now. The district court has said that it intends to protect Beverly Hills' interest, and we're simply asking this court to send the case back to the district court so that he can do that. Thank you. Thank you very much, counsel. On the issue of the tideliness of appeal, I'd just like to read from Pitt River. We concluded that the district court's remand order did not constitute a final order appealable by the Oregon Natural Resources Council. We apply the LCA three-part standard. We held that a remand order failed to satisfy the third prerequisite, that review would, as a practical matter, be foreclosed if an immediate appeal were unavailable. We explain that, generally, a remand order may be deemed a final order only where the agency appeals the remand, because an agency cannot appeal its own decisions. Only agencies compelled to refashion their own rules face the unique prospect of being deprived of review altogether, which is the third factor of the LCA test. It was on that basis that we did not appeal. What we did instead was we waited to see what Judge Wu would do. Facts changed after the remand order. Facts changed that it took much longer to do the remand than was ever articulated or expected. At the same time, the agencies accelerated the process for binding themselves to each other, the FTA, to give Metro billions of dollars to construct the alignment, and in turn, Metro to Tudor Perini to build one particular alignment, alignment purportedly under review. Importantly, Philip Washington of Metro explained in a deposition below that once the FFGA was signed, Metro would be unable to change the alignment. That was his statement. I think it impacts the full funding of grant agreement because of reasons I just mentioned, that it was not conveyed to the feds. It's not what they predicated their approval on in terms of the grant that we would be executing. It's a cardinal change. So what does Beverly Hills really want? So it's very interesting. I'm going to get to that because there was a fairly interesting explanation by my adversary about what's going on here. What Beverly Hills wants is for this alignment to move across its campus to the Constellation Station underneath its ball fields. That's what it wants. Now, interestingly, on July 6, 2017, we received a letter from Philip Washington that explained that they would be unable to consider alternative alignments, Metro, to Constellation because of the existence of the design-build contract. He says, and I quote, A notice to proceed with the construction of the Section 2 stations and tunnels was issued to the design-build contractor on April 26, 2018. How do you think I can follow everything you're saying when you talk like you're crazy? I'm so sorry, Your Honor. Yeah, I know. I'll be so happy. I apologize. Yeah. A notice to proceed with construction of Section 2 stations and tunnels. Why do you have to read? Why can't you just look at me and tell me? Well, I think it's important for you to hear the exact language that Philip Washington used in the letter. Then tell him that you're reading Philip Washington. I apologize. I am reading to you. By video, so he can't see everything. I apologize. I apologize, Your Honor. On July 6, 2017, Philip Washington, who is the CEO of Metro, who previously testified at record page 479, that once he entered into the full funding grant agreement, Metro could not consider other alignments. Just two days ago, we received a July 6 letter from Philip Washington in response to the district's suggestion that we could reach a compromise on the placement of the alignment that would allow Metro to run the alignment from Wilshire Rodeo to Constellation Boulevard, but just under a different location, which would have fewer negative impacts on the school district. In response, Philip Washington wrote to us, and he told us that they could not consider any of those alternative alignments, even to Constellation Boulevard, and the reason they couldn't do that is because they had entered into the design-build contract, and that each month, conservatively, Metro expends $6 million towards the Constellation alignment, and they will be utterly unable to make any changes without suffering significant financial harm. Now, I understand that Judge Wu has taken the position that when FTA publishes its SEIS, its final SEIS, if it attempts to rely on the money it's spent under these contracts, he will find that that's predetermination. The problem is, and this was articulated well in Forest Guardians, which is it doesn't matter how good that SEIS looks. It doesn't matter how rational it is. If ultimately that document could not have, those agencies could not have given fair consideration to alternatives because of the existence of these commitments, very large commitments. Why couldn't Judge Wu find that at the time, given exactly what you just said, letters like this, which seem to look like irretrievable commitments, et cetera, et cetera, based on the contract? Why couldn't he find, as a reason to disapprove of the SEIS, exactly what you said? He could, in theory, but I want to explain why it's important that the panel and the court consider this now. In Latham v. Volpe, which was a Ninth Circuit case decided in 1971, the issue was that no environmental analysis had begun whatsoever, yet the federal government was using federal money or allowing money to be used to buy homes, buy up homes in a particular area that was one of the areas where they might run a highway. In explaining why it was not acceptable to wait to do the environmental analysis until later and continue to buy the properties, the court said this, to paraphrase, in the language of NEPA, there is likely to be an irreversible and irretrievable commitment of resources, which will inevitably restrict the options. Either the highway planners will have to undergo a major expense in making alterations in a completed plan, or the environmental harm will have to be intolerant, too much environmental harm will have to be tolerated. It is all too probable that the latter result will come to pass. In reaching that conclusion, Latham v. Volpe cited a Sixth Circuit case called National- and we'll finish on this. In that Sixth Circuit case, as Volpe pointed out, the Sixth Circuit said, although we think that NEPA has not been followed here, we are so late in the process, and it would be so chaotic to make changes now, we feel our hands are tied. Today, if these contracts are set aside or the funding is stopped, we have a chance to make this decision correctly now and not have to wait until remand, until the moment that construction is about to begin. All right. Thank you very much, Counsel. Beverly Hills Unified School District v. the FTA is submitted, and this session of the Court is adjourned for today. All rise.
judges: Pregerson, Wardlaw, Chen